## In re REFERENDUM PETITION NO. 30, STATE QUESTION NO. 94.

No. 9752—Opinion Filed Oct. 8, 1918.

(175 Pac. 500.)

(Syllabus.)

1. Statutes—Referendum Petition—Qualification of Electors—Presumption—Evidence.

The fact that the lists of registered voters of the several counties of this state which were furnished in the year 1916 to the secretary of state by the several county registrars, in compliance with the act of the Legislature approved February 26, 1916 (Laws 1916, c. 32), fail to show that the names of persons who signed a referendum petition appeared thereon, was not sufficient to overcome the presumption that the persons so signing such referendum petition were qualified electors of the state and legally entitled to vote on the measure which they, by their petition, asked to be referred.

2. Same.

The petition, ballot, title, and evidence in this case examined, and held to be sufficient to invoke the referendum prayed for.

Referendum petition No. 30, State Question No. 94, protested by W. T. Salmon. From a ruling of the Secretary of State, declaring the petition sufficient, the protestant appeals. Petition declared valid, and clerk ordered to transmit all papers on file relating to petition to Secretary of State, with direction to the latter.

O. J. Logan and Warren K. Snyder, for appellant.

Thomas J. O'Neill and George S. Evans, for appellees.

TISINGER, J. The Sixth Legislature, at its regular session in 1917, passed Senate Bill No. 111, entitled "An act amending section 6910, Revised Laws of Oklahoma, 1910, same relating to the practice of medicine," which was approved by the Governor on March 27, 1917 (Laws 1917, c. 164). On April 3, 1917, certain citizens filed in the office of the secretary of state a copy of a petition which they desired to circulate for the purpose of invoking a referendum upon this act of the Legislature, and on June 1, 1917, filed therein pamphlet petitions, purporting to be signed by 30,592 qualified elec-

tors of the state, asking a vote on said enactment, pursuant to law.

On June 11, 1917, W. T. Salmon duly protested against said petition on the grounds: First, that more than 15,000 of the names signed to the petitions are not the names of qualified registered voters of the state; second, that the heading of the petition is insufficient, and not such as required by law; and, third, that the ballot title does not state the gist of the prosecution to be submitted to the voters of the state, and is therefore insufficient. At the hearing before the secretary of state both sides appeared by their attorneys, and the secretary, after hearing the evidence offered, overruled the protest and declared the petition sufficient. From this decision the protestant has appealed to this court.

The grounds relied on by the protestant at the hearing before the secretary and the grounds relied on in this court on appeal, as set out in protestant's brief and in the oral argument, are that many of the subscribers of the petitions were not registered voters of the state; that many of them did not state their respective post office addresses that some of the subscribers signed the petitions more than once; that carbon copies of some of the petitions were filed, instead of the originals; and that the circulators of the petitions, who made the affidavits thereon, had not complied with the law in regard thereto. It appears from the evidence that at the last general election preceding the filing of the referendum petition the state office receiving the highest number of votes cast was the office of presidential elector, and that the total number of votes cast for these offices was 242,416, making it necessary for the petition to be signed by at least 14,621 legal voters, in compliance with the requirement of section 2, article 5, of the Constitution.

The method adopted by the protestant for the purpose of establishing by evidence the grounds of his protest was as follows: Several persons of past experience in clerical work were employed by him to examine the petitions on file and to compare the names of the petitioners with registration lists from the several counties of the state on file in the office of the secretary of state, for the purpose of determining whether or not the petitioners were registered voters of the counties named as their counties of residence; also to ascertain from an examination of the petitions if the petitioners and the circulators of the petition had stated thereon their respective post office addresses, if there was any duplication of signatures, if the affidavit required to be made by each

circulator was made in accordance with the requirements of law, and if the oath was administered to such circulator as required by law. These several witnesses made memoranda of the result of their investigations, and for the purpose of refreshing their memories, used these memoranda when giving their testimony. The memoranda so used were in turn offered as evidence and appear as exhibits in the case. It appears from the testimony of these several witnesses that 10 813 persons whose names appeared on the petitions did not show to be registered voters of the counties named as their respective counties of residence, according to the lists of the registered voters of such counties on file in the office of the secretary of state.

For the purposes of this case we will assume it to be necessary that persons who sign initiative and referendum petitions should be registered as qualified electors of the state, as required by section 2, chapter 24, Session Laws 1916. But, assuming this to be a correct statement of the law, the testimony of these witnesses on this question is not sufficient to overcome the presumption that the signatures which they question were those of legally qualified electors. The universal registration act of 1916 (Session Laws 1916, chapter 24) makes it the duty of every qualified elector to register as such elector, and prohibits him from voting unless he registers as provided in the act. It provides that the secretary of the state senate shall appoint in each county a qualified elector as county registrar, who in turn shall appoint a precinct registrar in each precinct in his county, and it is made the duty of the precinct registrar to register each qualified elector of his election precinct, who makes application between the 30th day of April and the 11th day of May, 1916, and it is made the duty of every qualified elector to register within such time. It is further made the duty of the precinct registrar to register as qualified voters of his precinct electors who voted at the general election on the first Tuesday after the first Monday in November, 1914, without application therefor, and to deliver a certificate of registration to each of such voters, if he is still a qualified elector in his precinct, and the failure to so register any elector who voted in the election held in November, 1914, does not prevent such elector from voting. The act also provides for special registration for newly qualified electors in any precinct in the state, making it the duty of the precinct registrar to register them in application therefor during a period beginning not more than 20 days and ending not less than 10 days before any elec-

tion. It also provides for the registration of electors who might change their residence after registration, and for the registration of those who will become qualified electors between the time of closing the registration and the date of holding any election.

The lists of registered voters of the several counties filed in the office of the secretary of state, with which witnesses compared the names on the referendum petitions and from this comparison compiled the data from which they testified, were furnished by the county registrars in compliance with the act of the Legislature approved February 26. 1916. Session Laws 1916, c. 32, p. 87. This act required the county registrar of each county in the state to furnish the secretary of state a complete list of the names and post office addresses of all legal voters resident in his county on or before the 1st day of June, 1916, and biennially thereafter. The purpose of the act was to enable the secretary of state to comply with that portion thereof which required him to mail to each voter of the state, not more than 40 and not less than 30 days before any election at which state questions are submitted for approval or rejection by the people a copy of the state pamphlet containing the full title and text of each measure, the argument for and against it, and the sample ballot showing how each question upon the s'ate question ballot shall appear thereon. This act was amended by the act of the Legislature approved March 30, 1917 (Session Laws 1917, c. 173, p. 306), providing a different method for giving information and publicity as to state questions about to be submitted, to wit, by publication in newspapers. It appears from the evidence in this case that in compliance with the requirements of the act of February 26 1916, lists of legal voters of each county of the state, with the exception of four or five, were furnished to the secretary of state prior to July 20, 1916.

But these lists necessarily did not include the names of many legally qualified voters of the state. This court knows that there was a special election in the state in August, 1916, at which several proposed constitutional amendments were submitted to the people for adoption or rejection, and that the regular presidential election was held on Tuesday after the first Monday in November, 1916; also that many municipalities held elections after June 1, 1916, and before the referendum petition was filed on June 1, 1917. Many qualified electors were entitled to register as such for the purpose of voting at these elections, and their names would not appear on the lists in the possession of the secretary of state, however full and complete they might have been at the time they were furnished. Many qualified electors might also have changed the county of their residence between June 1, 1916, and June 1, 1917, and their names might not appear on these lists. It is also evident from the language of the registration act of 1916, that the Legislature took into consideration the fact that mistakes might be made in the compilation of the original lists, for it provides that electors who voted at the general election on the first Tuesday after the first Monday in November, 1914, were entitled to registration as qualified electors without applying therefor, and that a failure to register such an elector should not prevent him from voting.

For the reasons suggested, as well as for other reasons on which we will not elaborate, it will be seen that the testimony on which protestant relies for the purpose of showing that 10,813 citizens who signed these referendum petitions were not legal voters of the state is very unreliable. At least it is not sufficient to overcome the presumption that they were such legal voters, and the burden was on the protestant to overcome this presumption by competent legal testimony. In re Initiative Petition No. 23, State Question No. 38, 35 Okla. 49, 127 Pac. 862.

Protestant further contends that 4,982 citizens who signed these petitions failed to give their post office addresses, as required by statute, and that 2,151 other signatures are invalid for the purpose of invoking the referendum because of other defects apparent on the face of the petitions and specifically pointed out by his witnesses. From a careful examination of the voluminous record in the case, we conclude that some of these objections are well founded. It would be remarkable, indeed, if inaccuracies and technical departure from the rules and forms prescribed by law did not occur when so many citizens sign their names and so many circulators of the petitions make the affidavits. But it would be an unjust rule to deprive the honest signers, who, in sufficient numbers, have carefully complied with the requirements of law of their right to have their signatures counted because some other signers fail to give their post office addresses, or because the signers or circuators of the petitions in some way violated a technical requirement of the law. In fact, the statute requires only a substantial compliance with the procedure therein prescribed, and directs that clerical and mere technical errors shall be disregarded. Revised Laws 1910, § 3393.

But, even admitting that the names of

4,982 citizens, who protestant alleges failed to give their post office addresses, should not be counted, and that the 2,151 other signatures, which protestant alleges are invalid for other reasons, should be added thereto, we still have left 23,459 valid signatures of legal voters of the state. Only 14,621 such signatures were required in order to comply with the law, and it would seem that the petition is more than sufficient, as to the number of qualified electors of the state who signed it, to invoke the referendum thereby demanded.

As to the ballot title prepared and filed with the secretary of state and with the Attorney General, it appears that the parties submitting the proposition have complied with the law. The ballot title was prepared by the Attorney General, acting in conjunction with the attorney for the parties submitting the proposition and contains the gist of the measure, without any argument or statement either for or against it. The protestant has offered no substitute title for the one prepared and filed, as required by section 3377, Revised Laws 1910. We therefore hold that the ballot title filed with the secretary of state and approved by the Attorney General is in legal form and in harmony with the law.

We have carefully considered the evidence in this case, and the objections presented by the protestant. It is our finding and judgment that the referendum petition is valid and under the form as required by the statute; that it bore the signatures of a sufficient number of citizens and legal voters to require the submission of the question involved to the qualified electors of the state at the next general election; that the ballot title filed with the secretary of state is in legal form and in accordance with law. It is therefore ordered that the clerk of this court shall transmit all papers and documents on file in his office relating to such petition to the secretary of state, who is directed to conform to the requirements of the law in accordance with this opinion.

All the Justices concur.